**Christine KUWAHARA, SSN 343–46–5199, Plaintiff,**

v.

**Otis BOWEN, Secretary of Health and Human Services, Defendant.**

No. 84 C 7352.

United States District Court, N.D. Illinois, E.D.

Jan. 15, 1988.

Frederick J. Daley, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., Frederick H. Branding, Asst. U.S. Atty., Donna Morros Weinstein, Chief Counsel, and Donna L.

Calvert, Asst. Regional Counsel, Dept. of Health & Human Services, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Christine Kuwahara ("Kuwahara") seeks judicial review of a final decision by the Secretary of Health and Human Services ("Secretary") denying in part Kuwahara's claim for disability insurance benefits under Social Security Act ("Act") §§ 216(i) and 223, 42 U.S.C. §§ 416(i) and 423.[1] After an April 25, 1985 hearing (the "Hearing"), on March 20, 1986 Administrative Law Judge ("ALJ") Larry Miller:

　1.　granted Kuwahara benefits beginning January 18, 1981 but

　2.　denied benefits for the preceding period beginning October 13, 1978.

On July 22, 1986 the Appeals Council ("Council") modified that decision, finding Kuwahara disabled as of "October, not the first, 1980."[2] Council's decision was Secretary's final determination. Kuwahara has brought this action under Section 405(g) to appeal Secretary's denial of benefits for the period from October 13, 1978 to October 1980.

Kuwahara and Secretary have now filed cross-motions for summary judgment. For the reasons stated in this memorandum opinion and order, both parties' motions are denied and this action is remanded to Secretary for further proceedings consistent with this opinion.

### Introduction

Kuwahara's disability benefits application has been wending its way through the review process since December 1982. Indeed, as suggested by this action's "84 C"

case number, this is Kuwahara's second time around in this Court: Its December 12, 1984 unpublished order had remanded the case because of flawed handling by Secretary. This time the sole remaining issue is whether, following that remand, Secretary properly concluded Kuwahara's disability began in October 1980 rather than two years earlier. This opinion therefore deals only with the date of onset, so it will largely ignore Secretary's decision and the evidence as to Kuwahara's condition after 1981.

After detailed review this Court has concluded:

　1.　It cannot endorse Secretary's decision that Kuwahara was capable of performing her past work as a hospital ward secretary.

　2.　There is also more than a serious question whether substantial evidence supports Secretary's other conclusion that, for the time period in question, Kuwahara retained the capacity to perform unskilled work at all levels of exertion except for work in highly stressful situations.

Because of Secretary's handling of that second conclusion, this case must be remanded. But even if Secretary were assumed correct in that respect, remand is still required for another reason. That is so because Secretary has in all events failed to analyze the matter under the proper legal standards to determine whether Kuwahara was disabled at the relevant time. In effect, Kuwahara prevails in the current battle, but her ability to win the war remains in doubt.

### Facts [3]

Kuwahara, now 36 years old, was 27 at the time she asserts the onset of disability

---

**1.**　All further citations to Act provisions will take the form "Section—," referring to the Title 42 numbering rather than to the Act's internal numbering. Regulations drawn from 20 C.F.R. will be cited "Reg. § —."

**2.**　Throughout its decision Council describes the onset date of Kuwahara's disability in that manner (R. 283), without explaining either the derivation or the significance of "not the first." If a

more precise date is necessary to calculate the benefits owing Kuwahara, it can be supplied by Secretary if Secretary adheres to his prior determination on remand.

**3.**　On the current appeal Secretary has furnished this Court the administrative record beginning at page 259, omitting much of the material from Kuwahara's first hearing before an ALJ. That earlier record, which had been filed with this

due to mental illness. She is a college graduate with a degree in biology (R. 361). Kuwahara worked as a medical secretary at Grant Hospital until October 1978, when she was forced to quit her job due to severe hand tremors that she claims were brought on by stress (R. 362–63). She then undertook about a year's treatment with psychotherapist Barbara Roy ("Roy").

Kuwahara had a part-time babysitting job in the summer of 1979 (R. 490) and that fall began a course at Evanston Hospital to be trained as a licensed practical nurse ("LPN") (R. 362). She successfully completed the course in July 1980 (*id.*) and, although there is some dispute over her emotional and physical condition during the course, she graduated with honors (R. 491) and passed the LPN licensing exam in 1981 (R. 367).

In September 1980 Kuwahara gave birth to her daughter. According both to her own testimony and to other record evidence, her condition became more acute after her daughter's birth. Kuwahara testified she had a "breakdown" at Christmas 1980 (R. 366), and in January 1981 she was hospitalized for 12 days due to her psychiatric condition (R. 547). Her husband testified to her strange behavior beginning at that time (R. 492). From the time of that hospitalization Kuwahara has been treated with various medications such as Elavil and Thorazine.

In June 1981 Kuwahara took an overdose of her medication and was hospitalized at Ravenswood Hospital, where she began treatment with psychiatrist Charles Kaegi (R. 547). Dr. Kaegi diagnosed Kuwahara as suffering from bipolar disorder, a form of manic depression (R. 460, 669). Her medication was changed to lithium carbonate, a drug used in the treatment of depression and manic disorders (R. 548). Beginning in July 1981 Kuwahara was also treated by Ravenswood Hospital staff therapist Katherine Weigle ("Weigle") (R. 429–30). Although the record reflects only one additional period of hospitalization (in December 1982), Kuwahara has remained on medication and has been under psychiatric treatment by a number of doctors since that time.

On December 21, 1982 Kuwahara applied for disability benefits, claiming she had been disabled since October 1978 because of a mental disorder manifested in part by severe tremors of her hands. After her application was denied by Social Security administrators she requested a hearing, held before ALJ Richard VerWiebe on December 13, 1983. His February 27, 1984 decision (R. 516–25) denied benefits, finding Kuwahara (1) had the residual functional capacity ("RFC") to perform a wide range of unskilled work before October 1980 (R. 523) and therefore (2) was not disabled for a continuous twelve month period before the expiration of her insured status on June 30, 1981 (*id.*). However, ALJ VerWiebe did find Kuwahara unable to return to her past relevant work as a hospital ward secretary at any time up to the date of his decision (R. 522–23). After Council declined to review that decision (R. 530), this Court was constrained to remand the case to Secretary for further consideration (R. 590–91).

ALJ Miller then conducted the Hearing, with Kuwahara represented by counsel. Testimony was given by Kuwahara, her husband Michael Kuwahara, her father-in-law Harry Kuwahara, Weigle, Dr. Kaegi and Dr. Leroy Leavitt, a psychiatrist serving as medical advisor to the Social Security Administration. Vocational expert William Schweish was also there, but the record contains no testimony or other evidence supplied by him. Because assessment of the Hearing testimony and medical evidence is the primary issue on appeal, this opinion will defer discussion of the evidence until the ground rules for review are set out.

*Applying the Statutory Framework*

To establish entitlement to disability and supplemental security income benefits, a

---

Court before its 1984 review, was not made available for preparation of this opinion. However, that has not impeded review, because all relevant material was contained in the record for the post-remand period. Though the parties have made a few references to material in the absent portion of the record, none of that evidence is disputed.

claimant must show he or she is "disabled." Sections 416(i)(1) and 423(d) define "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months....

Secretary has promulgated extensive procedural regulations for determining whether an applicant is disabled. *Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984) summarizes Secretary's five-step test for determining "disability":

> The following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520 (1983).[4]

Once a claimant has demonstrated an impairment of sufficient severity to prevail at step 4, *Smith v. Schweiker,* 735 F.2d 267, 270 (7th Cir.1984) teaches:

> The burden then shift[s] to the agency to show the claimant retained the residual functional capacity to perform other work existing in the national economy.

At that fifth and final step Secretary must consider all the claimant's physical and mental impairments (Regs. §§ 404.-1561, 416.961), the claimant's age (Regs.

§§ 404.1563, 416.963), education (Regs. §§ 404.1564, 416.964) and work experience (Regs. §§ 404.1565 and .1568, 416.965 and .968). Toward that end the ALJ typically looks to the "Grid," medical-vocational guidelines (found at 20 C.F.R. Subpart P, Appendix 2) that balance the claimant's physical limitations against the other relevant factors (Regs. §§ 404.1569, 416.969).[5] Before doing so the ALJ must determine what type of work a claimant is capable of performing in light of his or her impairments. Secretary's regulations define types of work using physical exertion criteria (Regs. §§ 404.1567, 416.967).

Alternatively the ALJ may base the step 5 determination on other evidence, including the assessment of a vocational expert (Regs. §§ 404.1566(e), 416.966(e)). Indeed, when a claimant suffers from nonexertional impairments exclusively or in addition to exertional impairments, the ALJ may not be able to rely solely on the Grid—resort to a vocational expert may be required (see Reg. Subpart P, Appendix 2, § 200.00(e); *Warmoth v. Bowen,* 798 F.2d 1109, 1110 (7th Cir.1986) (per curiam)).

In all events, Secretary's decision must be upheld unless (1) the findings are not supported by substantial evidence or (2) Secretary has applied incorrect legal standards (Section 405(g)). *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), has defined "substantial evidence" as:

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

### Secretary's Decision

After explaining the five-step disability test, ALJ Miller proceeded with a thorough

---

**4.** As of the date of the Hearing *Johnson v. Heckler,* 769 F.2d 1202, 1209–13 (7th Cir.1985) had invalidated step 2 of that formulation. ALJ Miller therefore did not use that step when evaluating Kuwahara's alleged disability. Since then, however, *Bowen v. Yuckert,* — U.S. —, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) has upheld the validity of step 2, reversing an opinion by the Ninth Circuit that had reached the same result as *Johnson.* On June 16, 1987 the Supreme Court therefore vacated and remanded

*Johnson,* — U.S. —, 107 S.Ct. 3202, 96 L.Ed.2d 690. Given the result in this opinion, the ALJ's prior handling of the step 2 issue is irrelevant.

**5.** Because ALJ Miller found Kuwahara was able to perform her past work at step 4, he did not need to go on to a step 5 finding. *Garfield,* 732 F.2d at 607 n. 2. All the same, he seems to have done so in part (see n. 8).

summary of the evidence, including that pertinent to determining the onset date of Kuwahara's disability. There was a good deal of evidence pointing to either of two time periods in that respect.

On the one hand, several factors supported an October 1978 onset date:

1. Both Kuwahara and her husband testified her tremors began in August 1978 and were severe enough to force her to stop work in October.

2. Kuwahara was hospitalized at Grant Hospital from July 23 to August 3, 1978, complaining of weakness, light-headedness, nausea, tremors and weight loss.

3. Roy's 1985 letter relating her 1978 and 1979 [6] treatment of Kuwahara for depression said Kuwahara's hand tremors made her unable to handle her work as a hospital secretary (R. 657). Roy also said Kuwahara's problems with tremors and concentration made it "hard to imagine" she would be able to work in the field of nursing (id.).

4. Based on Kuwahara's Hearing testimony, Roy's statement and the records of the Grant Hospital treatment, Dr. Kaegi submitted a statement (R. 669) that as of October 1978 Kuwahara met the requirements for two listed mental impairments: Affective Disorders and Schizophrenic, Paranoid, and Other Psychotic Disorders. He said the symptoms of Kuwahara's bipolar disorder first appeared in 1978 and since that time she has been unable "to function at her premorbid level" (id.).

On the other hand, there were also several factors contradicting an onset date before October 1980:

1. In 1979–80 Kuwahara was able to complete her LPN training successfully and, in fact, to graduate with honors and pass the state licensing examination.

2. Kuwahara's 1978 hospitalization was for physical and not emotional problems. There was a single reference in the hospital records to Kuwahara's complaint of hand tremors. No mention was made of any psychological diagnosis, and the discharge diagnosis was "abnormal glucose tolerance ... perhaps early diabetes" and a "sterility problem" (R. 667).

3. Kuwahara's husband testified her condition deteriorated after her daughter was born in September 1980. He also said her weight loss in 1979 was due to a strict diet to control her borderline diabetes as well as emotional problems (R. 488–89).

4. Weigle said Kuwahara had represented to her that she had been a "lively, active, gregarious woman prior to her first breakdown in 1980" (R. 448).

ALJ Miller discounted Dr. Kaegi's conclusion that Kuwahara suffered from listed impairments as of 1978. He pointed out that was several years before Dr. Kaegi's treatment of Kuwahara began and said the conclusion was not supported by the evidence considered by Dr. Kaegi (R. 292). In addition the ALJ noted Dr. Kaegi had submitted identical mental RFC assessments for the periods of October 1978 to June 1981 (R. 676–77) and July 1981 to November 1985 (R. 674–75), despite the wealth of evidence in the record that Kuwahara's mental impairment worsened during the later period (R. 294). Overall the ALJ concluded Dr. Kaegi was "overreaching" to find Kuwahara disabled during the earlier period (id.).

ALJ Miller ultimately decided that as of January 18, 1981 Kuwahara was suffering from an affective disorder, an impairment listed at Section 12.04 of Secretary's regulations. In reaching that result the ALJ rejected the testimony of Secretary's medical advisor Dr. Leavitt that Kuwahara remains capable of working (R. 292). For the period before January 1981 ALJ Miller decided Kuwahara "retained the capacity for unskilled work, particularly ... outside of

---

**6.** As ALJ Miller noted (R. 290, 294), the dates in Roy's letter make no sense and can best be recast this way: She saw Kuwahara two to three times a month from October 19, 1978 to May 11, 1979 and then five times in the fall of that year. Roy also reports Kuwahara worked as a babysitter in the summer of 1978 and entered the LPN program that fall. In fact those events occurred in 1979.

the stress and turmoil of a hospital setting ..." (R. 294).

ALJ Miller concluded his discussion with the following findings (R. 295):

3. The medical evidence establishes that the claimant has a severe affective disorder.

4. Prior to January 18, 1981, the claimant had the residual functional capacity to perform unskilled work-related activities except for work involving highly stressful work situations (20 CFR 404.-1545).

5. Prior to January 18, 1981, the claimant had the residual functional capacity to perform a wide range of work activity at all levels of exertion (20 CFR 404.1567).

6. The testimony of the claimant, her husband, and her treating sources is persuasive; however, the testimony respecting the period prior to January 18, 1981 is not supported by the necessary medical or nonmedical documentation to support a finding of disability.

7. Section 404.1569 of Regulations No. 4 and Rule 204.00 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that the claimant, considering her residual functional capacity, age, education and work experience, was not disabled prior to January 18, 1981.

7. The claimant's impairments did not prevent her from performing her past relevant work as prior to.[7]

8. Since January 18, 1981, but not prior thereto, the severity of the claimant's impairment has met the requirements of section 12.04, Appendix 1, Subpart P, Regulations No. 4 (20 CFR 404.-1525).

9. The claimant has been under a "disability," as defined in the Social Se-curity Act, since January 18, 1981, but not prior thereto (20 CFR 404.1520(d), (e) and (f)).

That set the stage for review by Council.

On appeal, Council agreed with the ALJ that as of January 18, 1981 Kuwahara met the requirements of Section 12.04 of the listed impairments (R. 263). However, Council modified the ALJ's decision by finding that between October 1980 and January 1981 Kuwahara could not perform her past relevant work and further that "any jobs she could perform would not exist in significant numbers" (*id.*). Finally Council concluded that before October 1980 Kuwahara had retained both (1) the capacity to perform her past relevant work and (2) the RFC to perform unskilled work at all levels of exertion except for work in high stress situations (R. 264).[8]

### *Kuwahara's Arguments*

Kuwahara contends Secretary's conclusion that she could perform her past relevant work is not supported by substantial evidence. Instead she maintains the evidence amply supports an onset date of October 1978. Those ultimate conclusions, Kuwahara says, flow from Secretary's having improperly discounted the opinions of treating Dr. Kaegi and psychotherapist Roy and having ignored lay evidence—notably the testimony of Kuwahara and her husband—about her condition beginning October 1978.

Kuwahara's contentions must be addressed at two levels—at both step 4 and step 5 in the sequential disability determination. Accordingly this opinion will treat successively with the analysis in those terms.

---

7. This finding (the second one bearing the same number 7) is—like the others—copied verbatim.

8. One point of confusion should be noted at this juncture. Each of Council and ALJ Miller apparently conducted both step 4 and 5 evaluations on Kuwahara. Council explicitly found Kuwahara capable of performing her old job at Grant Hospital (R. 264, Finding 8), while the ALJ may have inadvertently included such a finding (that was the second of his findings bearing the same number "7" and appears to be a boilerplate finding stating neither the relevant work nor the date, R. 295). In any event Kuwahara's filings here (P.Mem. 7–8) proceed on the understanding that the operative finding was Council's determination that she was capable of performing her former work. Secretary Mem. 4–5 does not contradict that reading of the decision below.

### Step 4 Determination

■ Secretary found Kuwahara was capable of returning to her former job as a hospital medical secretary (also described at times in the record as a hospital ward clerk). In endorsing the vast majority of ALJ Miller's conclusions in that respect, Council relied primarily on the discussion supplied by the ALJ.

However, Kuwahara's ability to return to her former work was not a central focus of the ALJ's decision. Instead the ALJ included that solely in the "Findings" section of his decision, and it is open to some question at best (see n. 8). But in any event this Court must first see whether that finding is supported by substantial evidence. Only brief discussion is needed to demonstrate the compelled "no" answer to that question.

It is uncontradicted that Kuwahara left her former job because she was no longer able to carry out her duties due to severe hand tremors brought on by stress. Both Kuwahara and her husband so testified, and that was confirmed by Roy (who began treating Kuwahara at that time).

ALJ Miller's discussion in this area focused on Kuwahara's ability to do unskilled work generally. He did not deal with her ability to carry out the specific demands of her former job—the comparison the law mandates, as this Court has frequently noted (e.g., *Banks v. Bowen*, 672 F.Supp. 310, 317 (N.D.Ill.1987) and cases cited there; accord, *Bauzo v. Bowen*, 803 F.2d 917, 925–26 (7th Cir.1986)).

Secretary Mem. 4 describes the requirements of Kuwahara's former job:

> This job required plaintiff to make and receive telephone calls, order supplies, transcribe doctors' notes by hand, supervise and train other secretaries....

Uncontroverted Hearing evidence demonstrated Kuwahara's stress-induced hand tremors prevented her from performing many of those tasks. She testified her attacks would be brought on by the occurrence of medical emergencies such as cardiac arrests (R. 363), and the shaking could be so bad she would be unable to dial the telephone (*id.*). In that respect, ALJ Ver-Wiebe's earlier review found one of Kuwahara's duties would be to inform families of a patient's death (R. 519), certainly a stress-inducing responsibility. Importantly, ALJ Miller at no point questioned the credibility of Kuwahara or the other witnesses (such as her husband) who testified to her condition.

In sum, there is simply no substantial evidence to conclude Kuwahara retained the RFC after October 1978 to return to her old job. In February 1984 ALJ Ver-Wiebe had concluded (R. 522–23):

> [C]onsidering the stressful nature of the claimant's past relevant work as a ward secretary, the undersigned does not believe that the claimant could have returned to that past relevant work at any time before the date of this decision....

*Nothing* in the evidence before ALJ Miller derogates from that conclusion.

Normally the conclusion that Secretary's step 4 finding was clearly unsupported by substantial evidence would complete this Court's role. It would simply remand the case to Secretary for a supplemental step 4 determination or for a step 5 inquiry (see *Banks*, 672 F.Supp. at 318–20). Here, however, the fact that both ALJ Miller and Council went on to issue findings under step 5 compels this Court's consideration of whether *that* determination has been supported by substantial evidence and decided under the correct legal standards. In fact, that inquiry appears to be the central issue in Secretary's determination of the case.

### Step 5 Determination

As already stated, Secretary found Kuwahara retained the RFC before October 1980 to do unskilled work, except for that involving a high degree of stress. Then, in moving from that premise to his conclusion of nondisability, Secretary merely coupled his RFC finding with Kuwahara's age, education and work experience and mechanically applied the Grid's medical vocational guidelines. This opinion will examine both steps of that analysis.

### 1. Onset Date of Kuwahara's Impairment

Secretary found it was October 1980 before Kuwahara lost the RFC to work—the onset date for disability determination purposes. Any such determination dating back seven to nine years is a daunting task, here made all the more difficult by the nature of her impairment—a psychological one less amenable to concrete diagnostic techniques (see *Poulin v. Bowen,* 817 F.2d 865, 873–74 (D.C.Cir.1987)).

*Lichter v. Bowen,* 814 F.2d 430, 434 (7th Cir.1987) (emphasis added) has set out the standards for establishing a disability onset date:

> Social Security Ruling 83–20 ("SSR 83–20") describes how the onset date of a disability should be determined. SSR 83–20, at 109 (C.E.1983).... In disabilities of nontraumatic origin, three factors are to be considered in determining the onset date: the applicant's allegations, work history, and medical and other evidence. SSR 83–20 describes the date alleged by the applicant as "[t]he starting point" in determining the onset date, *id.* at 110; that date "should be used *if it is consistent with all the evidence available,*" *id.* at 111.... Medical evidence is described as "the primary element in the onset determination," *id.* [at 110], and the date chosen *"can never be inconsistent with the medical evidence of record,"* *id.* at 111.

*Lichter,* 814 F.2d at 435 confirmed (as Kuwahara Mem. 13 argues) that the onset date can precede the date of diagnosis.

■ Of course the opinions of treating physicians are of great value in making the onset-date determination (see *Stephens v. Heckler,* 766 F.2d 284, 288–89 (7th Cir. 1985)). But medical opinions, as well as lay testimony, can be discounted by Secretary when they are inconsistent with other evidence in the record.

Such inconsistencies might perhaps be found significant here as a medical matter—and by a medical practitioner. During the period Kuwahara alleges she was disabled, she was able to attend nursing school successfully. According to her husband she did quite well in her course work and completed the program with honors (R. 491). Kuwahara said at least one of the reasons she did not then begin working as an LPN was that she was well along in her pregnancy (R. 366). She did work as a babysitter for a six-month-old child during the summer of 1979 (R. 490).

On the other hand, a diagnosing psychiatrist could reasonably—and in this case did—reject those matters in favor of evidence pointing the other way. There are several such matters in addition to those already identified in this opinion:

1. Much of the course work in the LPN program was a repeat of courses Kuwahara had taken some years earlier in college (R. 365–657).

2. Kuwahara and her husband also testified to her continued problems with hand tremors (R. 365), her frequent crying spells (R. 399) and her difficulty with some of the clinical portions of the course requiring manual dexterity and strength (R. 400, 491).

3. Kuwahara also missed a number of school days because of her impairment (R. 365).

It is of course true that under appropriate circumstances Secretary can permissibly discount the treating medical professionals' interpretation of the evidence. Any doctor's judgment merits consideration based on the degree to which it is supported by medically acceptable evidence (*Whitney v. Schweiker,* 695 F.2d 784, 788 (7th Cir.1982); Reg. § 404.1526). And sometimes a treating physician may be inclined to "lean over backwards" to support a patient's disability application out of sympathy and a long standing relationship (*Stephens,* 766 F.2d at 289; *Cummins v. Schweiker,* 670 F.2d 81, 84 (7th Cir.1982); *Cullotta v. Bowen,* 662 F.Supp. 1161, 1170 n. 26 (N.D.Ill.1987)).

Necessarily Dr. Kaegi's opinion that Kuwahara was disabled in 1978 (R. 669) was not based on his first-hand treatment and observation of his patient, whom he did not

begin to treat until June 1981 (R. 459).[9] Under those circumstances he had to look to Kuwahara's testimony, the report by therapist Roy and the Grant Hospital records from mid–1978.

Roy had treated Kuwahara approximately two or three times monthly for the better part of a year. In her one-page report written in July 1985 she reported Kuwahara as having been quite depressed, having difficulty coping with routine responsibilities and spending her days in bed (R. 657). Kuwahara had also expressed suicidal tendencies to Roy (*id.*). Roy opined that it was unlikely Kuwahara could have handled the demands of nursing work.[10] She also discounted Kuwahara's performance in the LPN program and as a babysitter. Roy stopped seeing Kuwahara in late 1979 because of Kuwahara's financial difficulties (though there was also an indication the hand tremors had diminished in the school environment) (R. 365).

As for the Grant Hospital records, they reflect Kuwahara was hospitalized in 1978 for physical problems, including her difficulty in becoming pregnant. There is but a single reference to her hand tremors (R. 659) and no hint of any psychological or emotional problems. Her discharge diagnosis was of possible diabetes as well as a sterility problem (R. 667).

■ This state of the record, coupled with the very nature of mental disability, makes it especially inappropriate for an ALJ to play amateur doctor (see *Lundquist v. Heckler*, 670 F.Supp. 781, 785 (N.D.Ill.1985)). It is just as impermissible for an ALJ (or for Council) to substitute his (or its) "medical" judgment for that of a reputable physician, based on substantial medical evidence, as it is for this Court to substitute its judgment for that of an ALJ in weighing conflicting evidence.[11] And it cannot be gainsaid that a treating psychiatrist, familiar with his patient and her mental disabilities as a result of his direct observations, can fairly recognize in hindsight that factors observed by others at a time before he began treatment were telltale signs of the same disabling mental problems existing at that earlier date.[12]

That being true, the situation is one in which the ALJ and Council rejected Dr. Kaegi's opinion despite its having been based on a resolution of factors that could legitimately support that opinion. That may of course be done by Secretary where he is choosing between two such opinions. In this case, though, the ALJ specifically rejected the only other medical opinion in the record—that of Dr. Leavitt (Secretary's medical advisor, rather than a treating physician) as to Kuwahara's alleged capability to work even after the date on which the ALJ found her disabled.

All this, however, does not call for an outright reversal. This Court cannot tell what Secretary would have done with an

---

**9.** Dr. Kaegi's treatment of Kuwahara was also limited to visits of 15 minutes or less and primarily involved evaluation of Kuwahara's medication rather than intensive psychotherapy (R. 458–59, 531). Dr. Kaegi also had limited experience with evaluations under the Secretary's listing of mental impairments. When asked at the Hearing how long he had been familiar with the regulations, he replied facetiously "For about five hours" (R. 474) (to which the ALJ replied, "That long, huh?" (*id.*)).

**10.** This opinion has already confirmed the unreasonableness of any holding as to Kuwahara's ability to perform her prior work. At this point, however, the inquiry is as to Kuwahara's thenexisting ability to perform *other* work.

**11.** This Should not be misunderstood as unduly critical of ALJ Miller's efforts. Indeed, his recommended decision (R. 285–96) represented a studied and thoughtful review of the evidence, followed by a similarly thorough effort at evaluation of that evidence. But where that effort failed was in crossing the line between credibility determinations (wholly permissible for an ALJ) and a layman's appraisals of the medical significance of medical symptoms (impermissible for an ALJ, except in the context of choosing between medical professionals' opinions by finding some entitled to greater weight than others).

**12.** For example, that might well be true of the severe hand tremors Kuwahara was evidencing (tremors serious enough to force her to quit work), when coupled with her reported depression, inability to cope, suicidal tendencies and other factors, even though all those things had not led to contemporaneous psychiatric treatment. And Dr. Kaegi might legitimately find Kuwahara's school performance as nonequivalent to performance in a work environment.

application of proper analytical methods. Consequently a further remand is the appropriate remedy. And because (as will be seen) Secretary also mishandled the final issue in the case, an issue that may recur on the remand, this opinion goes on to discuss that as well.

2. Determinations Involving Nonexertional Impairments

■ Kuwahara's psychological problems beginning in October 1978 are a nonexertional impairment (see *Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 536–37 (6th Cir.1981)). Given such an impairment, Secretary's regulations say the medical vocational guidelines do not by themselves direct a factual conclusion on disability (Reg.Subpart P, Appendix 2, § 200.00(e)). As *Heckler v. Campbell,* 461 U.S. 458, 462 n. 5, 103 S.Ct. 1952, 1955 n. 5, 76 L.Ed.2d 66 (1983) put it:

> Thus, the regulations provide that the rules will be applied only when they describe a claimant's abilities and limitations accurately.

When a nonexertional impairment prevents a claimant from performing the full range of work of which he or she is physically capable, Secretary must look to occupational reference materials or the services of a vocational expert (*Warmoth,* 798 F.2d at 1110).

Here Secretary found Kuwahara retained the RFC to do unskilled work without an exertional impairment (R. 295). Secretary also found Kuwahara would not be able to handle work in highly stressful situations (*id.*). Although a vocational expert attended the Hearing, the transcript contains no record of any testimony, and the ALJ made no reference to any other evidence submitted, by that expert. Under Section 423(d)(2)(A) the testimony of the expert or some other occupational evidence was necessary to show Kuwahara, despite her impairment, remained capable of work that existed in significant numbers in the economy.

This is not a case where Secretary can rely solely on the Grid despite a nonexertional impairment. Secretary made no finding that Kuwahara's impairment did not restrict a full range of gainful employment at her level of exertional capacity (see *Nelson v. Secretary of Health and Human Services,* 770 F.2d 682, 685 (7th Cir. 1985) (per curiam)). Nor can this be labeled as a case where the nonexertional impairment obviously has little effect on the range of work the claimant can perform (*Warmoth,* 798 F.2d at 1112; cf. *McLamore v. Weinberger,* 538 F.2d 572, 575 (4th Cir.1976) (pre-Grid case in which the existence of significant jobs that the claimant could perform was "within the common knowledge and experience of ordinary men …")).

Appellate courts properly frown on efforts to take judicial notice of the availability of jobs with specific vocational requirements (*Kirk,* 667 F.2d at 536–37 n. 7; *Wilson v. Califano,* 617 F.2d 1050, 1053–54 (4th Cir.1980)). This Court has no desire to play armchair vocational expert.

### Conclusion

With reluctance, given the already-convoluted history of this case, this Court finds another remand is essential because of not one but two substantive errors by Secretary. This action is remanded to Secretary for a prompt determination, under the proper legal standards, of whether Kuwahara was disabled from October 13, 1978 to October 1980.