**David JOHNSON, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

**No. 96 C 3537.**

United States District Court, N.D. Illinois, Eastern Division.

June 19, 1997.

Marcie E. Goldbloom, Frederick J. Daley, Frederick J. Daley, Ltd., Chicago, IL, for Plaintiff.

Carole Judith Ryczek, United States Attorney's Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

On February 13, 1995, an Administrative Law Judge (ALJ) denied David John-

son's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), 1381a, 1382c(a)(3)(A). He now appeals that decision in federal district court as permitted by 42 U.S.C. § 405(g), which grants federal courts the power to review the Social Security Commissioner's final decisions [1] via a federal civil action. The accepted procedural vehicle for obtaining judicial review of a social security benefits determination is a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, which both Johnson and the Commissioner have submitted here.[2] For the reasons that follow, we affirm the ALJ's decision.

## RELEVANT FACTS

We begin with a brief overview of the facts, then move on to a more detailed review of the record. Johnson is a 35–year–old man who currently lives with his father and sister. He has at least a tenth grade education [3] and is capable of reading, writing, and basic math. Johnson's memory and intellect are within normal limits, although he testified that his grade school recommended placement in special education—an option his father rejected. From 1979 (the year Johnson would have graduated from high school) until he left his most recent position in 1993, Johnson held jobs as a retail store janitor, hotel housekeeper, gas station attendant, hotel clerk, and food service worker.

Johnson suffers a back malady stemming from a 1990 injury he sustained while working as a food service employee at United Airlines. After undergoing back surgery, Johnson returned to work and was placed on a "light duty" assignment to accommodate his reduced physical capacity. Although the surgery initially alleviated his back pain, the pain soon returned and intensified, accompanied by leg pain, to the point that Johnson claims he could no longer work in even a sedentary capacity. Johnson stopped working at United Airlines in early to mid–1993.[4] During the summer and fall of that year, Johnson received treatment for his back and leg pain, which included a short stint at a pain treatment center.

In addition to his back ailments, Johnson suffers from an eye condition that limits his vision, and has been diagnosed with depression and a substance abuse disorder. Johnson's psychological problems did not surface until 1994, when he was hospitalized ten days in August and two days in September for alcohol and cocaine intoxication. He was diagnosed with polydrug dependence, manifested in acute toxic psychosis, and atypical affective disorder. Johnson's symptoms, which included depression, anxiety, and paranoia, diminished significantly with detoxification, and the acute toxic psychosis was re-

---

1. Before filing this action, Johnson pursued his claim through administrative channels, requesting that the Appeals Council review the ALJ's decision. *See* 20 C.F.R. § 404.967 (party dissatisfied with hearing decision may ask the Appeals Council to review it). When the Appeals Council denied review, the ALJ's ruling became the Commissioner's final decision. *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir.1994); *see* 20 C.F.R. § 404.981. We therefore refer to the ALJ and the Commissioner interchangeably.

2. Although both parties have moved for summary judgment, we do not apply the familiar summary judgment standard of "genuine issue of material fact" employed under Rule 56. When a district court reviews an individual social security case, the court's review is limited to a determination of whether the record contains substantial evidence to support the agency's decision, and whether the agency applied the proper legal standards. *See Hamilton v. Secretary of Health & Human Servs.,* 961 F.2d 1495, 1501 (10th Cir.1992) (Kane, J., concurring); *Ehrhart v. Secretary of*

*Health & Human Servs.,* 969 F.2d 534, 538 (7th Cir.1992). Essentially, we treat Johnson's motion for summary judgment as a motion for an order reversing the Commissioner's decision and the Commissioner's motion as one for an order affirming her decision. *See Garcia v. Califano,* 463 F.Supp. 1098, 1100–01 (N.D.Ill.1979).

3. The record contains conflicting evidence on the duration of Johnson's high school career. He testified at the hearing that he finished only tenth grade, but indicated on a SSA Disability Report that he obtained a GED and told his psychiatrist that he had a high school education. (R. 53, 162, 231).

4. The evidence conflicts as to exactly when and why Johnson left his job. Johnson testified at the hearing that he left in February 1993 because the company no longer had work for him (R.63), but one of Johnson's disability reports to the SSA states that he stopped working in June 1993 because of his back condition (R. 158).

solved before Johnson's latest discharge. When asked at the administrative hearing whether he had mental impairments, Johnson mentioned that he possesses some "character defects," but did not report depression or substance abuse. In response to further questioning, he told the ALJ that he was no longer using drugs or alcohol, and that he had taken antidepressant medication for only a month and stopped. Other than the brief August and September 1994 hospitalizations, Johnson has never been under the care of a psychiatrist and has not since returned for inpatient psychiatric treatment.

Johnson filed for SSI benefits on November 22, 1993 (with a protected filing date of September 15) and for DIB in February 1994, alleging that he had become disabled as a result of his back injury and the residual pain from surgery. His applications were denied on May 31, 1994 and June 21, 1994. Johnson filed a timely request for reconsideration, which was denied on October 6, 1994. Represented by counsel, he appeared before ALJ Bonny Barezky on January 23, 1995. She denied Johnson's applications for benefits in a ruling issued February 13, 1995, finding that Johnson was capable of performing his previous light duty job at United Airlines. Johnson next petitioned the Appeals Council to review the ALJ's decision; his request was denied on February 26, 1996. After the Council extended Johnson's time to appeal, he filed a complaint in this Court on June 12, 1996, requesting review of the Commissioner's final decision. Johnson does not contest the ALJ's decision as it relates to the functional restrictions of his physical impairments. Rather, he claims that the ALJ's decision denying benefits lacks substantial evidentiary support insofar as it ignores the limitations imposed by his mental impairments. We now consider the record to determine whether Johnson's assessment is correct.

## I. Johnson's Testimony

At the hearing, Johnson was assisted by counsel, who began the proceedings by telling the ALJ, "this is basically a pain case." (R.50). When asked what impairments Johnson was claiming, the attorney answered that Johnson's back problem and attendant pain were the basis for alleging a disability. He said nothing about mental impairments. Consistent with this focus, the evidence addressing Johnson's mental impairments constitutes a very small portion of the record. Given that Johnson's challenge is to the ALJ's consideration of mental impairments only, our discussion of Johnson's physical impairments is limited.

Johnson was 33 years old at the time of the hearing. He lives in Chicago with his father and sister, who assist him physically and take care of all the housework and shopping. Johnson has struggled academically: he told the ALJ that his last full year in school was tenth grade and that he was held back in fourth grade. Johnson was never enrolled in special education classes, but attributes this to his father's refusal to follow the school's recommendations. Still, Johnson considers himself to be "pretty good" at reading and writing, adding, subtracting and multiplying. He believes he can read a newspaper (or could before his vision began to deteriorate) and is capable of finding the programs he wants to watch in *T.V. Guide*.

Johnson held various jobs between 1979 and 1986. In 1987, he began working for United Airlines as a food service employee. Following his surgery in 1990, Johnson returned to work in a light duty position, where he was responsible for such tasks as rolling silverware, filling salt and pepper shakers, and making coffee bags. He was required to lift no more than ten pounds. The job was full-time, and permitted Johnson to alternate between sitting and standing at will. At times, he was allowed to go to the company medical facility and lie down. Johnson stopped working in February 1993 because United "didn't have any work for me to do at the time." But what ultimately prevented him from returning is debilitating back and leg pain. Johnson testified that he still has a strong desire to work; to this end, he tried on a number of occasions to return, without success. He did not attribute his failure to return to work to feelings of depression or problems with substance abuse.

As his back problems became more severe in mid–1993, Johnson began abusing crack

cocaine and alcohol. His substance abuse culminated in a short period of hospitalization during the fall of 1994. He was treated by Dr. Gomez, a psychiatrist. Gomez diagnosed Johnson with polydrug dependence and atypical affective disorder, and prescribed a trial of antidepressant medication. Johnson took antidepressants for a month in September 1994. He couldn't remember the name of the medication, but thought it was similar to Prozac. Asked whether taking the pills alleviated his depression, Johnson said he couldn't tell, but Dr. Gomez seemed to think it was helping. Johnson did not indicate that he was still suffering from depression, and antidepressants did not surface in the litany of Johnson's current medications. Relating the status of his problem with substance abuse, Johnson told the ALJ that he was not currently using either cocaine or alcohol, and had been clean for about three months. He has never been arrested or lost a job because of alcohol or other drug abuse.

When asked whether he believes that he presently suffers from any mental impairments, Johnson responded only that he has some "character defects":

A: Let me see if I can explain them to you. Sometimes I feel that people are doing things intentionally to me, you know, and in reality nobody is doing anything to me. You know, I feel that sometimes people are out to get me sometimes [sic], you know, this is even prior to my accident, but I've been dealing with it pretty good. I guess you could call it paranoia or whatever, but sometimes it feels as though people are just trying to misuse me.

Q: And did you have this before your drug abuse?

A: Yes, I did. Do you know, and then, you know, sometimes like if I'm with a coworker or something like that, and I'm not doing my job right, or I'm not—you know, it's not—this is the way it's supposed to be done, you know, I'll get pissed off at my coworker because it's not helping him and it's not helping me and it's not helping her and it's not helping me, you know, and I don't feel good being the dumb one, or whatever, or being the one

that they couldn't complete or do the task, you know. And then I'll get angry. (R.77). Johnson also included in his discussion of character defects the fact that he sometimes has difficulty getting along with coworkers, but explained that "I'm the same person that would apologize . . . afterwards." *Id.* He often feels as though others do not want to be around him.

After questioning Johnson about mental impairments, the ALJ moved on to his daily activities. Johnson leads a very sedentary lifestyle; his back problem reportedly prevents him from doing housework, yardwork, running errands or pursuing hobbies. Johnson has few friends and rarely goes out. His sole form of recreation appears to be watching television, an activity that consumes about ten hours of his day on average. He did drive himself to the hearing—a 25–minute trip—and testified that he drives himself to medical appointments. The ALJ also noted for the record that Johnson "repeatedly had to get up during this hearing and sit down intermittently." (R.88). Although Johnson reports eating only one meal per day and having lost 30 pounds in four months, the ALJ remarked at the hearing that Johnson "appear[s] to be well nourished." (R.80). Johnson has trouble sleeping, but attributes this to the fact that he frequently must change positions during the night to relieve his back pain. He also sleeps on and off during the day.

## II. Other Testimony

Two medical experts testified at the hearing: Dr. Newman, an orthopedic surgeon, and Dr. Scheffler, an ophthalmologist. The ALJ heard no psychiatric or other testimony on Johnson's potential mental impairments. Dr. Newman presented his opinion on the nature and severity of Johnson's back impairment, and its effect on Johnson's neurological functioning and exertional capacity. With regard to the nature of Johnson's back problem, Dr. Newman testified that

he's got a slightly degenerated L5 intervertebral disc with slight bulging. The bulging is into the neuroforamin on the right side, but doesn't impair the—doesn't impinge the nerve root, the S1 nerve root

at that level. And that's on the basis of the recent myelogram or post myelogram CT. (R.89). Dr. Newman noted that Johnson's treating physician performed a procedure that is normally done to alleviate nerve root impingement, even though objective testing did not indicate such a condition, but that this treatment was in line with Johnson's subjective symptoms. Although severe, Johnson's back impairment did not meet any of those listed as conclusively disabling, in part because Johnson remained neurologically intact. Dr. Newman could not answer whether Johnson would have problems understanding, remembering and carrying out instructions at work, but he was limited in his ability to lift, bend, and sit or stand for prolonged periods. Dr. Newman concluded that Johnson was permanently restricted to light work.

Dr. Scheffler questioned Johnson about his visual impairment and the treatment he had sought for it. After extensive questioning, he opined that Johnson suffers from a condition called bilateral central serous detachment of the macular area of the retina. The condition is treatable and likely related to "a stress syndrome which this young man is experiencing." (R.99). While vision in Johnson's left eye was dramatically reduced, the much better sight in his right eye compensated to the extent that Johnson's overall vision was "adequate." Dr. Scheffler opined that there were no functional limitations whatsoever associated with Johnson's eye condition.

The hearing concluded with testimony from Cheryl Hoiseth, a vocational expert (VE). She opined that Johnson was capable of performing a variety of light work, based on the hypotheticals presented by the ALJ. The ALJ asked the VE what occupations were functionally feasible for a thirty–four–year–old male with a tenth grade education, the ability to read, write and use numbers, and the physical capacity to undertake light work. The VE was to consider that the man experienced chronic pain, noticeable at all times, but not severe enough to prevent him from being attentive to responsibilities on the job, and that he took medication that made him dizzy. In addition, the job would permit sitting and standing at will to relieve pain. The VE responded that Johnson's past work at United would satisfy these requisites. Next, the ALJ eliminated the sit/stand option from the hypothetical, asking what jobs would be available to this person if he could perform only sedentary work. The VE answered that such a person could find work as a cashier, telephone solicitor, surveillance monitor, assembler, and hand packager. Finally, the ALJ asked the VE to assume that the same person was afflicted with a substance abuse disorder that was "under control at this time." (R. 111). According to the VE, this person could perform the very same sedentary jobs. The regional economy boasted thousands of each.

On his cross–examination of the VE, Johnson's attorney asked whether Johnson's past job was merely "sheltered work," that is, work unavailable in the competitive economy because it is uniquely tailored to the employee's limitations. The VE initially responded that it would be "unusual" for an employer to permit lying down on occasion, which is what Johnson had testified was permitted him. After more questioning, the VE opined that having complete volitional control to stand, sit or lay down at the employee's discretion is not normally competitive employment; as such, if Johnson's past work with United Airlines truly permitted him to go to the medical center and lie down whenever he wanted, it could possibly be classified as a sheltered job.

### III. Medical Records

Two sets of medical records contain information bearing on Johnson's intellect and psychology. The first is a set of documents from Lake Forest Pain Treatment Center, where Johnson enrolled in a pain treatment program but left before completing it. The second consists of documents from Little Company of Mary Hospital, where Johnson was treated for alcohol and cocaine toxification and depression.

### A. Lake Forest Pain Treatment Center—September 1993

In August 1993, Johnson was referred to the Lake Forest Pain Treatment Center

(PTC) to address his persistent back and leg pain. As part of the process of determining whether Johnson was an appropriate candidate for the pain treatment program, a nurse at the PTC compiled Johnson's social, educational, and vocational history. Johnson told the nurse that he was living at home with his father. Because of his back pain, he had "slight to moderate difficulty" with household chores. (R.229). He reported that he drank beer socially two to three times per week, and denied using recreational drugs. He also told the nurse that he had a "12–year educational background." *Id.* Johnson denied any employment problems associated with his most recent job at United Airlines, and stated that his goal was to get back to work.

The PTC also assessed Johnson psychologically. The initial psychological evaluation, dated August 18, 1993, was performed by psychologist Neil Mahoney. Mahoney notes that Johnson was "admittedly depressed" over his back problems, but did not consider his depression severe. (R.231). Johnson reported feeling frustrated with his inability to return to work, and acknowledged experiencing friction with his boss and co–workers. Mahoney observed, however, that Johnson "presented in good humor with positive mood and affect," and was a self–described positive thinker. *Id.* Johnson was characterized in the evaluation as "something of an achiever," demonstrated by his remark that "you can't keep a good man down." *Id.* On August 25, pain treatment nurse Darnell Keesling reported the results of Johnson's testing on the Minnesota Multiphasic Personality Inventory. Among the problems the test identified were chronic pain syndrome and family disruption related to it, overdependence on others, and ineffective individual coping skills. Keesling mentioned nothing about depression, affective disorder, or substance abuse. She observed that Johnson's mood and affect were normal.

On August 31, 1993, the PTC treatment team recommended a four–week intensive inpatient pain management program, to which Johnson was admitted on September 6, 1993. He was discharged on September 15, nearly three weeks early, "for motivational rea-

sons." (R.237). According to one of the doctors, Johnson simply refused to alter his behavior. (R.329). Johnson's discharge summary notes that in addition to being resistant to treatment, Johnson "had a good number of concerns that were socioeconomic and litigious." Id.

## B. Little Company of Mary Hospital— August 5–15 and September 22–23, 1994

Johnson was admitted to Little Company of Mary Hospital (LCMH) on August 5, 1994 for chemical dependency. The admitting record lists the "principal procedure" to be performed as alcohol and drug detoxification and rehabilitation. Johnson's initial psychiatric consultation was performed by Dr. Gomez. He canvassed Johnson's symptoms, relating that Johnson

complains of dysphoria, anxiety, difficulties sleeping, both falling asleep and staying asleep, decreased appetite with 25 lb. weight loss, outbursts of anger, restlessness, occasional racing thoughts, mood swings "forever and forever," feeling like an outcast and occasional suicidal thoughts but he has never attempted or had a plan. He tells me that he usually laughs to cover up his feelings and indeed he does during our interview.

(R.279). Johnson told Dr. Gomez that he began drinking at age twelve, and had been using cocaine for about a year–and–a–half. Dr. Gomez reported that Johnson is a "high school drop out," but that his intellect and memory appeared to be within normal limits. (R.280). Johnson exhibited inappropriate affect during the consultation, often laughing at sensitive questions. Under the heading "Impression," Dr. Gomez listed 1) Atypical affective disorder and 2) Polydrug dependence.

Halfway through Johnson's stay, counselor Nanette Janik completed a Psychological/Psychiatric Services Referral Form, which indicated that Johnson exhibits the following problems: outbursts of anger with potential for violence (Johnson reported he had "blown up at work" on occasion); restlessness; unusually low mood, sadness and/or associated symptoms (Johnson described a

"history of feeling depressed"); anxiety (Johnson experienced racing thoughts and had difficulty slowing down); inappropriate affect (smiling inappropriately); and extreme oversensitivity. Janik did not mark the blanks next to below average intelligence, poor concentration, or difficulty following conversation. She also noted that, since being admitted a week earlier, Johnson "has shown a gradual improvement in his ability to slow down." (R.437).

Johnson was discharged on August 15, 1994, as reflected by the discharge/transfer summary completed by Dr. Gomez. The summary relates that Johnson was admitted for alcohol and cocaine dependency, and that his "uneventful" detoxification was completed on the second day. (R.404). Dr. Gomez remarked on Johnson's improvement and willingness to cooperate during the hospitalization. Although he "initially demonstrated a great deal of anxiety and had difficulty slowing himself down," after a week "these symptoms were gradually decreasing ..." *Id.* Johnson's affect "continued to become calmer." *Id.* Dr. Gomez also reported that Johnson had been "cooperative thus far and appears to have a sincere desire for help." *Id.* Johnson's discharge diagnosis was atypical affective disorder, for which Dr. Gomez prescribed an antidepressant called Pamelor. Johnson was discharged to Bill's Family Halfway House.

Johnson appeared to do well until September 22, 1994, when he was readmitted to LCMH with toxic psychosis from a cocaine overdose, expressing suicidal thoughts. From the ER he was transferred into psychiatric care, where the nurses on duty observed that Johnson was flat and withdrawn, and behaved in a guarded and paranoid manner. He was hostile, refusing to communicate, eat, or sign consent forms for treatment. Johnson's admitting diagnoses were: major depression, toxic psychosis, cocaine dependency, alcohol dependency, and atypical affective disorder. As the day progressed, however, many of Johnson's symptoms diminished. The nursing notes report that Johnson "felt bad earlier but now that the drugs are wearing off he feels better." (R.288). Although he remained somewhat guarded and suspicious, Johnson became communicative and cooperative, denying any lingering suicidal thoughts. Johnson was receptive to the nurse's "[w]arm frequent contacts throughout the shift," and finally left his bed to watch television in the day room. (R.289).

Johnson was discharged the next day. Dr. Gomez completed a report summarizing the two–day hospitalization. Johnson had come to LCMH intoxicated and acutely psychotic. His symptoms had included "neurovegetative signs of depression and occasionally some paranoia and some vague suicidal thoughts." (R.296). Johnson claimed that people were "following him," but Dr. Gomez believed this might be realistic given that Johnson had a workers' compensation case pending. Dr. Gomez performed a psychiatric exam and found that Johnson was no longer exhibiting overt psychosis or suicidal ideation. Johnson's mood and affect were fairly appropriate and his thought processes were sequential. His memory and intellect appeared to be within normal limits. While Johnson's toxic psychosis had been resolved, his discharge diagnoses included atypical affective disorder, cocaine dependence, alcohol dependence, and polydrug abuse. Dr. Gomez changed Johnson's antidepressant medication to Paxil and described his prognosis as fair.

## LEGAL STANDARDS

### I. Statutory and Regulatory Framework

To receive benefits, a SSI or DIB claimant must be "disabled" as defined by the Social Security Act. An individual is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. §§ 416(i); *see id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(C). A claimant is under a disability "only if his physical or

mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security regulations delineate a five–step process for determining whether a claimant is disabled: (1) Is the claimant unemployed? (2) Is the claimant's impairment or combination of impairments severe? (3) Does the impairment meet or exceed any of the specific impairments that the Social Security Administration lists as so severe that they preclude substantial gainful activity? (4) If the impairment has not been listed as conclusively disabling, does it nevertheless prevent the claimant from performing his former job? and (5) If the claimant cannot perform his past work, is he unable to perform other work in the national economy in light of his age, education, and work experience? *See* 20 C.F.R. §§ 404.1520, 416.920; *Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir. 1993). "An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled." *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir. 1985) (citation omitted).

If the claimant survives the first four steps to reach the fifth, the rules in the Medical Vocational Guidelines of Regulation Part 404, Subpart P, Appendix 2 ("the Grid") must be considered. *Shields v. Sullivan,* 801 F.Supp. 151, 155 (N.D.Ill.1992). The Grid incorporates a claimant's age, education, and work experience, as well as the claimant's residual functional capacity ("RFC") in determining what work he is able to perform. *Id.* "RFC is expressed in terms of a claimant's maximum sustained work capacity for either 'sedentary,' 'light,' 'medium,' 'heavy,' or 'very heavy,' work as those terms are defined by 20 C.F.R. § 404.1567." *Id.; see* 20 C.F.R.

§ 416.967. In assessing whether work is available for the claimant in the national economy, the ALJ may use a vocational expert (VE). 20 C.F.R. §§ 404.1566(e), 416.966(e). If the work that the Grid suggests the claimant can perform is available, then a finding of not disabled must follow. *See* 20 C.F.R. §§ 404.1566(b), 416.966(b).

## II. Standard of Review

Section 405(g) of the Social Security Act provides that a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). On appeal, "the findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be [considered] conclusive." *Id.* The resulting review is limited. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). The ALJ's decision will be affirmed if supported by substantial evidence. *Id.* "Although a mere scintilla of proof will not suffice to uphold the [ALJ's] findings, the standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). A reviewing court may not "re-evaluate the facts, reweigh the evidence, or substitute its own judgment" for the Commissioner's. *Luna,* 22 F.3d at 689.

## ANALYSIS

The ALJ determined that Johnson was capable of both unskilled sedentary work and returning to his previous unskilled, light duty job as a food service employee at United Airlines. In reaching this conclusion, the ALJ performed the five–step analysis required by SSA regulations. First, she found that Johnson was unemployed because he had not worked a full day since leaving United Airlines in February 1993. Second, she determined that Johnson suffered three severe impairments: post–operative back problems, bilateral central serous retinopathy, and substance abuse disorder under control. Third, none of these impairments, considered

separately or together, met or equaled conditions listed as conclusively disabling. In particular, Johnson's controlled substance abuse did not satisfy the listing for substance abuse disorders. Consequently, the ALJ moved on to consider Johnson's residual functional capacity (RFC) to perform his past work.

In assessing Johnson's mental RFC for employment, the ALJ recited the facts relating to Johnson's brief psychiatric hospitalizations:

> From August 5, 1994, to August 15, 1994, the claimant was hospitalized for chemical dependency. The claimant had a history of consuming alcohol and using cocaine for about one and one-half years. This was his first treatment attempt although he had gone to some meetings in the past. When he was discharged from the program on August 15, 1994, the claimant was sent to day treatment. Dr. Gomez diagnosed the claimant as having atypical affective disorder and polydrug dependence. He thought the claimant could benefit from a trial of anti-depressant medication as well as psychotherapy. On September 22, 1994, the claimant was admitted to the hospital because he was "acutely psychotic." The claimant was hospitalized overnight.... Dr. Gomez again attended the claimant ... According to Dr. Gomez, the claimant had resolved toxic psychosis, atypical affective disorder, cocaine and alcohol dependence and polydrug abuse. The claimant was transferred to the detoxification unit and chemical dependency program.

(R.29) (record citations omitted). She also summarized the results of her questioning about the status of Johnson's mental impairments: 1) although Johnson had used crack cocaine and alcohol from mid-1993 to late 1994, his substance abuse was currently under control; 2) Johnson had taken antidepressant medication for only one month in September 1994; and 3) he testified to character defects, which he clarified as difficulty getting along with co-workers, paranoia, and feeling dumb.

This evidence led the ALJ to conclude that Johnson was perfectly capable of performing his most recent job. As the VE testified, controlled substance abuse would not prevent an individual with Johnson's age, education, work experience, pain and back ailments from returning to his unskilled light duty food service job at United Airlines, or, for that matter, from engaging in unskilled sedentary work. In addition, the ALJ found much of Johnson's testimony about his limitations and restricted daily activity to be exaggerated.[5] In short, neither Johnson's mental nor physical impairments rose to the level necessary for a disability finding.

Johnson argues that the ALJ's opinion is unsupported by substantial evidence. Specifically, he takes issue with the ruling that Johnson's mental condition permitted him to perform his past work. The ALJ's decision on this point is allegedly deficient in four respects: 1) the ALJ improperly substituted her opinion for objective medical evidence that Johnson was suffering from mental impairments and, in particular, disregarded Dr. Gomez's diagnosis of atypical affective disorder; 2) she failed to adequately develop the record with respect to Johnson's intellectual functioning; 3) she failed to investigate possible psychosomatic origins for Johnson's pain; and 4) she erroneously determined that Johnson's past work with United Airlines was competitive employment. We address these contentions seriatim.

## I. Substantial Evidence Supports the ALJ's Determination That Johnson Retained the Mental Capacity to Work

At the outset, we begin with the general principle that the ALJ is not required "to evaluate in writing every piece of testimony and evidence submitted." *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985). Instead, we require only "a minimal level of articulation by the ALJ as to [her] assessment of the evidence." *Id.* Thus, "[i]f a sketchy opinion assures us that the ALJ

---

5. The ALJ commented that Johnson had made the 25-minute drive to the hearing independently and alternated between sitting and standing repeatedly during the hearing. Moreover, his alleged marked weight loss was questionable in light of the lack of independent evidence confirming it and by Johnson's healthy, well-nourished appearance.

considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985). We are mindful that "[t]he ALJs work under great burdens. Their supervisors urge them to work very quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits." *Id.* For this reason, "judicial review is properly quite limited." *Id.* at 288; *see also Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir.1993) ("Judicial review of administrative decisions is deferential.").

In general, it is the claimant's duty to prove to the ALJ that he is disabled. 20 C.F.R. § 404.1512(a). To this end, he must bring to the ALJ's attention everything that supports a disability determination, including medical or other evidence relating to the alleged impairment and its effect on his ability to work. *Id.* For her part, the ALJ has the responsibility to develop a "complete medical history" and to "make every reasonable effort to help [the plaintiff] get medical reports." *Id.* § 404.1512(d). If this information fails to provide the ALJ a sufficient basis for making a disability determination, or the evidence conflicts to the extent that the ALJ cannot reach a conclusion, she may seek additional evidence from other sources. *Id.* §§ 404.1512(e); 404.1527(c)(3). Options open to the ALJ include requesting additional records, recontacting the claimant's treating or examining sources, and asking the claimant for more information or to submit to a consultative examination. *Id.; Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir.1994).

■ Johnson argues that the ALJ stopped far short of securing information sufficient to determine how his mental condition affected his RFC, defined in the regulations as "what [work the claimant] can do despite [his] limitations." 20 C.F.R. § 404.1545(a). As evidence that the ALJ recognized Johnson's mental impairments but refused to investigate them adequately,

Johnson points to her questioning Dr. Newman whether Johnson would have difficulty understanding, remembering and carrying out instructions. In light of Dr. Newman's response that he was not qualified to comment, the ALJ should have attempted to glean the answer from a mental health professional, for example, by ordering a consultative examination. Instead, Johnson claims, the ALJ "played doctor," rendering her own unqualified judgment that he was mentally capable of performing his past work. Johnson asserts that the ALJ compounded her error by disregarding Dr. Gomez's diagnosis of atypical affective disorder (depression in layman's terms).

We find that there was no need for the ALJ to investigate any further. She based her decision about the effects of Johnson's mental condition on a sufficiently developed record, and her determination was supported by substantial evidence. The record revealed intense problems with substance abuse and depression for only a relatively brief, isolated period in Johnson's thirty–one year existence, a period that, according to Johnson, had ended at least three months before. Far from substituting her opinion for that of Dr. Gomez or other psychiatric evidence in the record, the ALJ simply recognized that much of it was irrelevant in light of Johnson's abstention from drugs and negligible history of mental disorder.[6]

■ When the evidence before the ALJ suggests a mental impairment, she has a duty to develop the record by inquiring into the present status of the impairment and its possible effects on the claimant's ability to work. *See Stambaugh v. Sullivan*, 929 F.2d 292, 295 (7th Cir.1991) ("When evidence of alcoholism is presented in the administrative hearing, the ALJ is required to inquire into the present status and possible effects of that alcoholism . . . . "). Here, the ALJ did exactly that, and through her questioning discovered that: 1) Johnson was not currently suffering symptoms of his diagnosed mental impairments or receiving treatment for them;

---

**6.** We do not address Johnson's argument that his depression met or equaled the listing for affective disorders because we uphold the ALJ's implicit determination that Johnson's depression was not severe. As such, Johnson's depression failed at step two of the five–step analysis, obviating the need to evaluate its equivalence to a listed impairment.

2) there was no evidence of chronic alcoholism or long–lasting depression; and 3) Johnson's present mental condition erected no obstacles to returning to his previous job.

First, the ALJ's questions about the state of Johnson's substance abuse problem and his current mental condition satisfied her duty to inquire into the status of mental impairments identified in the record.[7] Johnson told her he was no longer using drugs or alcohol and, in fact, had been clean for three months. When asked whether he suffered from any mental impairment, Johnson did not report feeling depressed. Treatment with an antidepressant was limited to the month of September 1994, and not listed as one of Johnson's current medications. Finally, the only mental impairments Johnson attributed to himself at the hearing were the "character defects" of friction with co-workers and feeling that he was being misused and picked-on—neither of which correspond to any formal diagnosis given Johnson. *See* 20 C.F.R. § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."). As such, the ALJ concluded, with substantial support, that Johnson's substance abuse (and by implication, his depression) was "under control."

Indeed, the objective medical evidence in the record reinforces the circumscribed nature of Johnson's mental impairments, confined to a two–month period in 1994 and linked to episodes of acute drug and alcohol intoxication. Johnson told Dr. Gomez at LCMH that he had never been treated by a psychiatrist before August 1994. Although he claimed to have been drinking since age 12, no objective evidence supports this claim,

and it is contradicted by Johnson's testimony that his problem with alcohol and drugs did not begin until mid–1993. Apart from documents relating to the LCMH hospitalization, the only medical evidence relating to Johnson's mental condition is the psychological testing and evaluations conducted by Lake Forest PTC in 1993, which say nothing about Johnson suffering from depression or struggling with substance abuse. To the contrary, Dr. Mahoney's psychological evaluation of Johnson paints a picture of an individual with a positive outlook and the determination to overcome his back problem and get back to work. Formal psychological testing at the PTC likewise failed to uncover problems with depression or substance abuse. Finally, both Dr. Gomez and nurses at LCMH remarked that Johnson's symptoms of mental disorder decreased markedly with detoxification, leaving the clear impression that Johnson's depression, paranoia, and defensive behavior were intimately entwined with the ingestion of toxic amounts of alcohol and cocaine. Given Johnson's testimony that he was no longer using these substances, the ALJ was substantially supported in concluding that the remainder of his mental impairments, which appeared only with drug abuse, were not currently severe enough to prevent work.[8] *See, e.g., Bunch v. Heckler,* 778 F.2d 396, 400–01 (7th Cir.1985) (claimant diagnosed with schizophrenia retained ability to do basic work because symptoms diminished with appropriate treatment during hospitalization).

■■■■ Second, the ALJ met her obligation to investigate the possible effects of Johnson's mental impairments, and her determination that they do not preclude returning to food service at United Airlines is

7. Congress recently amended the Social Security Act with the Senior Citizens Right to Work Act of 1996, P.L. 104–121, 110 Stat. 847, to prevent a finding of disability when alcoholism or drug addiction would be a "contributing factor" to the determination. Section 105(a)(1), *amending* 42 U.S.C. § 423(d)(2). It is unclear whether the amendment would apply to Johnson, *see Perkins v. Chater,* 107 F.3d 1290, 1293 (7th Cir.1997), but we need not decide that issue here, since we uphold the ALJ's finding that, even if substance abuse can be disabling, Johnson's involvement with drugs and alcohol is not.

8. We also note that a disability finding must be predicated on an impairment that "has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1527(a)(1). No objective medical evidence in the record indicates that Johnson's alleged mental impairments meet this durational requirement. *See, e.g., Bunch v. Heckler,* 778 F.2d 396, 400 (7th Cir.1985) (acute episode of schizophrenia lasting two months did not demonstrate that mental illness prevented substantial gainful activity for continuous twelve–month period).

supported by substantial evidence. Johnson's diagnoses of substance abuse and affective disorder do not force a finding of disability unless they sufficiently affect his ability to work:

> a claimant is not guaranteed disability benefits merely because [he] suffers from a medically verifiable impairment. A claimant also must show that, due to [his] impairment, [he] is precluded from engaging in any substantial gainful activity within the entire national economy.

*Oliveras v. Shalala*, 870 F.Supp. 411, 414 (D.Mass.1994) (citing *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S.Ct. 2287, 2291–92, 96 L.Ed.2d 119 (1987)).

In this case, no evidence in the record even hints that Johnson's mental condition prevents him from holding any job in the national economy. At the hearing, the ALJ elicited testimony that Johnson has never been fired for involvement with drugs or alcohol. In addition, the staff at Lake Forest PTC, who questioned Johnson about his employment history and had the objective of facilitating his return to work, did not learn about any psychological problems that interfered with Johnson's employment in the past, nor did they see depression or substance abuse as a barrier to his return. Rather, they commented only on his inability to manage pain. If the PTC staff, who evaluated Johnson's mental condition, did not link his poor coping skills and lack of motivation to his later diagnoses, neither should the ALJ. Likewise, Dr. Gomez, who diagnosed the mental impairments alleged here and was also aware of the demands of Johnson's previous job, never opined that they would prevent him from working. The Seventh Circuit affirmed the ALJ's decision in a similar case where the claimant's mental impairment appeared to be "situational and of brief duration," and there was no evidence that it "caused a marked restriction of daily activities, a constriction of interest, or a seriously impaired ability to

relate to other people." *Orlando v. Heckler*, 776 F.2d 209, 214–15 (7th Cir.1985).

 In light of Johnson's testimony that he had never been terminated for abusing alcohol or drugs; the absence of any evidence, from Johnson or otherwise, that his mental impairments had affected his ability to work in the past; and the silence from mental health professionals on any psychological impediments to future employment, the ALJ was justified in concluding that any mental impairment from which Johnson suffers does not prevent substantial gainful activity.[9] *See, e.g., Walker v. Bowen*, 834 F.2d 635, 642 (7th Cir.1987) (ALJ's determination that depression did not prevent work upheld where claimant conceded depression was not serious and doctor "did not suggest that [it] would detract significantly from his ability to do sedentary work."). As the Seventh Circuit has remarked, "it is always possible to do more. How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment." *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir.1993). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir.1994). After all, it is the claimant, not the ALJ, who bears the burden of presenting medical evidence of an impairment. *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir.1991); *see Luna*, 22 F.3d at 693 ("[I]t was [the claimant's] duty, under 20 C.F.R. § 404.1512(a), to bring to the ALJ's attention everything that shows that he is disabled.").

 . There is no merit to Johnson's argument that the ALJ "recognized that plaintiff's mental impairments might impose nonexertional limitations on plaintiff's ability to function" because she asked Dr. Newman whether Johnson would have trouble understanding, remembering and carrying out instructions. Pl. Br. at 24. The ALJ posed

**9.** This is especially true given the limited demands of unskilled work, which is defined as work requiring "little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). Unskilled jobs also "ordinarily involve dealing primarily with objects, rather than with data or people," Social Security Ruling 85–15, at 91 (cum. ed.1985), decreasing the significance of Johnson's alleged difficulty getting along with co-workers. The evidence in the record provides a sufficient foundation by which to conclude that Johnson possessed the mental capacity to perform such work.

this question just after Dr. Newman had finished testifying about the impact of Johnson's back condition on his neurological functioning. Consequently, the ALJ's question was more than likely a follow-up to Dr. Newman's testimony that Johnson's neurological capacity remained intact, not some kind of admission about the possible effects of Johnson's depression and substance abuse. Second, Dr. Newman's negative answer did not leave the ALJ without evidence to support her decision. As discussed above, the ALJ had before her both medical and nonmedical evidence bearing on Johnson's RFC—Johnson's testimony and evaluations from mental health professionals familiar with the demands of Johnson's former job. Under these circumstances, the ALJ was not rendering her own, unqualified medical judgment on Johnson's mental RFC to perform work. *See Diaz v. Chater,* 55 F.3d 300, 306 n. 2 (7th Cir.1995) (a claimant's RFC is a matter for the ALJ to decide, based on all the evidence in the record, both medical and nonmedical); *see also* 20 C.F.R. § 404.1527(c) (additional or expert evidence need only be sought when the evidentiary insufficiency or inconsistency prevents a determination).

The authority Johnson cites is not to the contrary. He relies on *Kuwahara v. Bowen,* 677 F.Supp. 553, 560 (N.D.Ill.1988), for the proposition that "the very nature of mental disability makes it especially inappropriate for an ALJ to play amateur doctor." The issue in that case, however, was whether the ALJ erred in rejecting the only medical opinion in the record regarding the onset date of the claimant's disability. *Kuwahara* is inapposite because the ALJ here did not reject anyone's medical opinion. The ALJ heard no psychiatric testimony. No medical opinion supporting Johnson's claim of mental impairment was ever presented to the ALJ.

■ Nor did the ALJ question the validity of Dr. Gomez's psychiatric diagnoses, which were introduced by Johnson. Rather, she asked Johnson about the status of his mental impairments and decided, based on the fact that Johnson was no longer exhibiting symptoms or receiving treatment, that he retained the RFC to return to work—a determination well within her competency.

■ Next, Johnson claims the ALJ violated the proscription in *Bauzo v. Bowen,* 803 F.2d 917, 926 (7th Cir.1986), that an ALJ may not determine RFC solely on the basis of "bare medical findings." As discussed above, however, the ALJ did not limit her consideration to bare medical findings; instead, she weighed the evaluations of mental health professionals together with nonmedical evidence, such as Johnson's testimony, in reaching her conclusion about Johnson's RFC. The other two cases Johnson cites as prohibiting independent medical determinations by an ALJ, *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990), and *Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985), fail to further his case because they both involve ALJs who rejected the medical opinions of qualified professionals, a sin of which we have found the ALJ innocent.

■ Johnson simply cannot escape the fact that "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." *Glenn v. Secretary of Health & Human Servs.,* 814 F.2d 387, 391 (7th Cir.1987). Johnson and his attorney chose to present this as a "pain case," focusing on Johnson's physical impairments almost to the exclusion of his mental condition. Consequently, they find themselves in the unfortunate position of the litigant who changes his theory of the case on appeal— with insufficient evidence to support the new theory. Johnson introduced no psychiatric testimony at the hearing, and the other evidence he submitted on the issue of mental impairment was minimal. Indeed, Johnson's own testimony significantly downplayed his earlier problems with substance abuse and depression. The ALJ properly concentrated on what Johnson and his counsel considered to be the important facts bearing on disability; it is a testament to her thoroughness that she devoted as many questions and as much space in her opinion as she did to the meager mental impairment evidence presented to her.

Moreover, the ALJ did her part by discharging her duty to compile a complete medical history, and her questioning and written opinion permit us easily to "track the ALJ's reasoning and be assured that the ALJ considered the important evidence." *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995) (quoting *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir.1995)) (internal quotations omitted). We have expressed consternation in the past when the opinion below has omitted or skimmed over the evidence, believing that "the better practice is to briefly address all the evidence militating in favor of a finding of disability and relied upon by the disability applicant since it is almost inevitable that the decision of the [Commissioner] will be appealed to the federal district court." *Connor v. Shalala,* 900 F.Supp. 994, 1004 (N.D.Ill. 1995). The ALJ here has followed this direction diligently, and we commend her for a conscientious treatment of the evidence. As the Seventh Circuit has observed, "one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." *Kendrick,* 998 F.2d at 456–57. It was unnecessary for the ALJ to do so here. Her decision that Johnson's mental condition leaves him with the RFC to perform his past light work and a number of sedentary jobs in the regional economy is supported by substantial evidence.

## II. The ALJ Adequately Developed the Evidence Relating to Johnson's Intellect and the Cause of Johnson's Pain

■ Johnson's next two arguments can be considered together and disposed of quickly. First, Johnson contends that the ALJ did not adequately investigate possible limits on Johnson's intellectual functioning. He asserts that the ALJ should have ordered psychological testing and obtained twenty-year–old records from the Chicago Public School system in light of Johnson's testimony

that the school may have suggested enrollment in special education when he was in grade school. Second, Johnson argues that his pain was "in excess of what most of the objective findings suggested," and, therefore, the ALJ should have investigated "the possibility of a mental impairment as a basis for some degree of the pain." Pl. Br. at 12. Both arguments are wholly without merit.

■ First, all the evidence in the record points to a finding that Johnson is perfectly capable of handling the intellectual demands of unskilled work. He did so for eight years at United Airlines and previously in a number of other positions. Psychological examinations conducted at LCMH just four months before the hearing revealed that Johnson's memory and intellect were normal. And Johnson testified that he was capable of basic reading, writing and math. Given this recent, persuasive evidence, what the Chicago Public School system had to say twenty years back is simply not relevant. For the same reason, ordering another psychological evaluation when the ALJ had before her the results of an examination conducted just months earlier would have been a waste of resources.

■ Second, even if Johnson's assertion that his subjective complaints of pain exceeded the objective medical evidence in the record were accurate (and it is not), the source of Johnson's pain is irrelevant. There is no requirement that the ALJ discern the root cause of every ailment the claimant suffers—after all, she is not a doctor, a truism that Johnson is so fond of pointing out. Rather, the ALJ's job is to determine the functional limitations imposed by the pain.[10] Here, her conclusion that Johnson's pain was not severe enough to significantly limit his ability to do basic work activities led to a finding of not disabled, *see* 20 C.F.R. § 404.1520(c), and Johnson does not contest it.

---

**10.** The only exception to this occurs when "the degree of pain alleged is significantly greater than that which can be reasonably anticipated based on the objective physical findings," in which case the ALJ must "carefully explore any additional limitation(s) imposed by the pain on the individual's functional ability beyond those

limitations indicated by the objective medical evidence before any conclusions about severity can be reached." Social Security Ruling 88–13, 1988 WL 236011, at *1 (July 20, 1988). There is absolutely no evidence here that Johnson's pain was "significantly greater" than the objective medical evidence would indicate.

### III. The ALJ's Conclusion That Substantial Gainful Activity Was Available to Johnson Is Supported By Substantial Evidence

Johnson's last argument is that his job with United Airlines was not "past relevant work" as defined by the Social Security regulations. *See* 20 C.F.R. § 404.1560(b) ("If you still have the capacity to do your past relevant work, we will find that you can still do your past work, and we will determine that you are not disabled. ....."). Instead, he claims, the food service job was a "make–work" position not found in the competitive job market. Therefore, the ALJ's finding that Johnson could engage in substantial gainful activity by returning to his previous job was error. In support of this contention, Johnson cites *Kolman v. Sullivan*, 925 F.2d 212 (7th Cir.1991).

In *Kolman*, the Seventh Circuit held that "a nonexistent makework training job is not past relevant work within the meaning of the regulations as we interpret them." 925 F.2d at 214. The regulation at issue was 20 C.F.R. § 404.1565(a), which provides that past relevant work is work that was "done within the last 15 years, lasted long enough for you to learn how to do it, and was substantial gainful activity." The plaintiff had worked as a "non–intervening security guard," a position created as part of a federal job training program that had since been terminated. *Id.* at 213. His duties departed substantially from those that would normally accompany a security guard position—for instance, he was not expected to "confront an intruder, come to the aid of a person being attacked, or in short do anything to 'intervene' in a dangerous situation that might erupt on his watch." *Id.* The uniqueness of his job, the fact that it was a "makework training job" created to prepare the plaintiff for real work, and, more importantly, the fact that the job no longer existed led the court to conclude that it was not past relevant work to which he could return and engage in substantial gainful activity. *Id.* at 213–14. Where the usual assumption that the plaintiff's past work exists in sufficient numbers is "dramatically falsified in a particular case,"

the court held, the ALJ must move on to determine whether the national economy offers other jobs commensurate with the plaintiff's capabilities. *Id.* at 213. Johnson claims that his food service job is as much a make–work position as the plaintiff's in *Kolman*.

■ Johnson's argument fails, for two reasons. First, the ALJ did determine that Johnson had the ability to perform other jobs in the regional economy besides his past work. She asked the VE what other jobs would meet Johnson's RFC if he were capable of only sedentary work. The VE responded by naming several positions, each of which existed in significant numbers throughout the regional economy. Johnson does not attempt to characterize any of these jobs as "make work" or ungainful activity. Second, Johnson's position is distinguishable from the non-intervening security guard job in *Kolman*. There is no evidence that the United food service job was temporary; indeed, Johnson was employed in that position for almost three years, starting right after his back surgery in 1990. Nor did Johnson testify that it was a training job, meant to prepare him for "real" work. Although United Airlines did not have work for Johnson at the time he left in 1993, the record does not suggest that the company had permanently eliminated his position—indeed, he remained on the employment rolls. In short, the assumption that Johnson's job at United Airlines was competitive employment has not been "dramatically falsified" in this case. *See Knight v. Chater*, 55 F.3d 309, 314–15 (7th Cir.1995) (*Kolman* does not apply when the claimant's past work is neither a temporary nor a training job).

■ Furthermore, substantial evidence supports the ALJ's determination that Johnson's job was gainful activity, defined as "work activity that you do for pay or profit." 20 C.F.R. § 404.1572(b).[11] There is no merit to Johnson's suggestion that his job was "sheltered," which the regulations use to describe a situation in which "you may or may not be earning the amounts you are being paid" because the work is being done "under

---

**11.** Johnson does not contest that his job was "substantial" as defined in the regulations.

special conditions," *see id.* § 404.1574(a)(2), (3). While the VE testified that it was unusual for a company to permit an employee to lie down occasionally, as Johnson did when experiencing back pain, she did not leap to the conclusion that Johnson was therefore not earning what he was being paid. Johnson bore the burden of proving that he was unable to perform his past work, *see Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5, 96 L.Ed.2d 119 (1987), and he presented no evidence that his ability to lie down at times diminished his productivity to the point that he was earning only $500 of the approximately $1500 per month he reported making during 1991 and 1992. *See* 20 C.F.R. § 404.1574(b)(2)(vii) (an employee has engaged in substantial gainful activity if his earnings averaged more than $500 per month after 1989).

In sum, Johnson's work situation at United Airlines was vastly different than the position in *Kolman* and he has failed to prove that the volitional control accompanying his job diminished his true earnings to an "ungainful" level. Moreover, even if Johnson's past work were simply make–work or "sheltered," this does not change the fact that the ALJ deemed him able to perform a number of unskilled sedentary positions that are plentiful in the regional economy—a finding that Johnson does not dispute.

## CONCLUSION

For the reasons stated above, the ALJ's determinations as to the functional limitations of Johnson's mental condition and his ability to engage in substantial gainful activity are supported by substantial evidence. While we are sympathetic to Johnson's disability claim, we cannot conclude that the ALJ's denial of the claim was erroneous in light of the evidence presented at the administrative hearing. Accordingly, we deny Johnson's motion for summary judgment and grant the Commissioner's motion for summary judgment. The decision of the ALJ is affirmed. The Clerk of the Court is directed to enter judgment, pursuant to Fed.R.Civ.P.

58, in favor of the defendant Commissioner and against plaintiff Johnson.