John L. GRAHAM, Plaintiff

v.

Kenneth S. APFEL, Commissioner of Social Security, Defendant

No. 3:98CV887 AWT.

United States District Court, D. Connecticut.

Sept. 1, 1999.

Michael J. Weisman, Bridgeport, CT, for plaintiff.

Deidre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for defendant.

### RECOMMENDED RULING ON PENDING MOTIONS

MARTINEZ, United States Magistrate Judge.

The plaintiff, John L. Graham, seeks review of the decision of the Commissioner denying the plaintiff's claim for disability insurance benefits and Supplemental Security Income ("SSI") benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). The plaintiff filed a motion for order reversing the decision of the Commissioner and the defendant moved for an order affirming the decision of the Commissioner. Upon consideration of the motions filed by the plaintiff and defendant, the court concludes that the plaintiff's motion should be denied and the defendant's motion should be granted.

### BACKGROUND

The plaintiff was born on April 23, 1946. (*See* R. 80, 180.)[1] He graduated from high school and received additional training as a machine operator. (*See* R. 116.) He has worked as a machine operator in two factories and for a cleaning service. (*See* R. 33–36.) He also ran a variety or small grocery store for approximately

---

1. The administrative record filed by the Commissioner shall be referred to as "R.".

three years.[2] (See R. 31–32.) The plaintiff closed his store and stopped working after he was involved in several automobile accidents. (See R. 33.)

The plaintiff's period of insured status for Title II purposes expired on June 30, 1992. (See R. 83.) The plaintiff states that he became disabled on January 1 or June 1, 1991, and claims that he is entitled to disability income benefits and SSI benefits because of a back disorder and seizures. (See R. 80, 112.)

The plaintiff filed applications for SSI and disability insurance benefits on April 22, 1996. (See R. 80–82, 180–81.) The applications were denied on July 9, 1996. (See R. 55–59, 183–87.) On August 28, 1996, the plaintiff filed a request for reconsideration. (See R. 60–68.) On November 19, 1996, the agency issued notices of reconsideration upholding the denial of benefits. (See R. 69–72, 183–87.) The hearing before the administrative law judge ("ALJ") was held on June 10, 1997. (See R. 22–52.) The plaintiff appeared with counsel at the hearing. (See R. 24.)

At the beginning of the hearing the plaintiff's attorney conceded that the facts did not support the alleged onset date of June 1, 1991 because the plaintiff operated a variety store after that date. The attorney stated that a more appropriate onset date would be the date of the plaintiff's first automobile accident in 1994. (See R. 29.) The ALJ informed the attorney that unless he could provide additional earnings information that would extend the plaintiff's last insured date beyond the revised onset date, the plaintiff would not be able to assert a claim for disability insurance benefits. (See R. 30.) Although the record was left open to enable the plaintiff to provide additional earnings information, no information could be located. (See R. 20–21.)

The plaintiff testified at the hearing about his pain. He said that he suffers from headaches two or three time per month and from neck, back and leg pain. He described the pain as constant, aching and sharp and indicated that he obtained relief from Tylenol with codeine. He said that the headaches were worse immediately following the 1994 automobile accident. (See R. 37.) The plaintiff went on to say that his lower back pain becomes worse if he stands or sits for too long. He began using a cane two years earlier. (See R. 38.) He said that he used the cane primarily outside of his home. Inside the house he could get around by holding onto furniture or the walls for support. His chiropractor prescribed a corset which he has been wearing since 1994. (See R. 39.) The plaintiff stated that he has obtained most of his therapy from his chiropractor and agreed with the ALJ's statement that his treating physician did not recommend therapy.[3] (See R. 40.) The plaintiff said that he used heat on his back at home and tried to do exercises. (See R. 41.)

The plaintiff testified that he has lived with his sister in her house for eighteen years. His sister and niece do all of the housework and laundry including caring for his room. His sister cooks and he eats his meals with the family. The plaintiff said that before the accident he never cooked for himself but did his own laundry. (See R. 42–43.) The plaintiff described his daily activities as lying down, sleeping, reading, watching television and walking onto the porch. He said that he shoveled snow and did yard work before the accident. (See R. 43–44.) Although he has a driver's license, the plaintiff stated that he rarely drove because he could not sit behind the steering wheel for very long. When he had to go to the chiropractor, his sister or niece took him. (See R. 46.) The plaintiff stated that he was able to care for

2. Elsewhere in the record, the plaintiff stated that he ran the variety store for ten years. (See R. 64.)

3. The treating physician's notes, however, indicate that the plaintiff was referred to a physical therapist for treatment. (See R. 171.)

his personal needs, but occasionally needed help putting on his shoes. (*See* .R. 51.)

The plaintiff said that he could stand for only ten to fifteen minutes at a time and could sit for "a little longer." (R. 47.) He thought he would be unable to do a job with a sit/stand option because he cannot stay in one spot for very long. (*See* R. 46.) The plaintiff stated that when he stands, he must lean against the wall or on his cane. If he stands too long, his legs "give out." (R. 47.) Although the plaintiff acknowledged that on the day of the hearing he had been alternating between standing and sitting from 6:00 until 11:00 a.m., he stated that he only did it because he had no choice. He would have preferred to be lying down. (*See* R. 47–48.) The plaintiff estimated that, on a normal day between the hours of 8:00 a.m. and 5:00 p.m., he spent approximately seven hours lying down. (*See* R. 48.)

In addition to the testimony at the hearing, the ALJ considered several reports and questionnaires completed by the plaintiff. In a disability report completed in April 1996, the plaintiff reported that no doctor had restricted his physical activities. (*See* R. 115.) The plaintiff stated that his sister did all of the housework and cooking while he spent his days reading, watching television and sometimes going to church. (*See id.*) The agency reviewer observed that the plaintiff experienced no difficulties during the interview but noted that the plaintiff's eyes appeared "bloodshot." (*See* R. 119.) In a reconsideration disability report completed in August 1996, the plaintiff described his pain as getting worse. Although he indicated that he walked with a cane, he again stated that no doctor had restricted his physical activities. (*See* R. 120.) The plaintiff noted that he visited his chiropractor weekly. (*See* R. 121.) When the plaintiff requested a hearing before an ALJ, the plaintiff described his pain as constant, especially in the morning. He said that it took three hours to be able to move about and that he experienced blurred vision. (*See* R. 126.)

In May 1996, the plaintiff completed pain and activities questionnaires. In the pain questionnaire, he stated that the pain began after he was involved in automobile accidents in September 1994, January 1995 and July 1995. The pain began in his low back and neck and spread to his mid-back and head. He said that constant pain is brought on by any activity. (*See* R. 128.) The plaintiff noted that the medication prescribed by his physician in 1994 sometimes relieved his pain. He also stated that he wore an orthopedic support belt and visited his chiropractor. (*See* R. 129.) In the activities questionnaire, the plaintiff stated that the only household chore he performed was taking out "the small trash." (*See* R. 131.)

In August 1996, the plaintiff completed a seizure questionnaire. He stated that each month he experienced two blackouts lasting two to three minutes each. He said that the seizures made him feel shaky and weak. He indicated that he took Dilantin to control the seizures. (*See* R. 134.)

The ALJ reviewed residual functional capacity assessments completed by the agency in July and November 1996. In both assessments, the evaluator rated the plaintiff as able to lift and carry fifty pounds occasionally, twenty-five pounds frequently, to stand or walk for six hours in an eight hour workday, sit for six hours and engage in unlimited pushing and pulling. (*See* R. 95, 103.) The plaintiff was restricted from climbing a ladder, rope or scaffold, and from working around hazards. (*See* R. 96, 98, 104, 106.) In November 1996, the evaluator also indicated that the plaintiff could crouch or stoop only occasionally. (*See* R. 104.)

The July evaluator noted that the medical records contained no evidence of seizures, while the November evaluator indicated that there was no evidence of any recent seizures and no indication that the plaintiff was taking any medication to control seizures. (*See* R. 96, 109.) The November evaluator opined that the plaintiff's

symptoms were attributable to a medically determinable impairment and stated: "This RFC *most likely applies* to the time prior to DLI of 6/92." (R. 109.)

A vocational analysis performed in November 1996, indicated that although he could not return to his previous employment and was approaching advanced age, the plaintiff could make an adjustment to other jobs such as cafeteria attendant, security guard or fast food worker. (*See* R. 110–11.)

The plaintiff also submitted two letters to the ALJ. (*See* R. 63–68, 141–45.) In the letters, the plaintiff described his condition as back and neck problems with pain radiating down his legs and arms, an ulcer, epigastric pain, pancreatitis and seizures. (*See* R. 63–64, 142.) He stated that he operated the variety store for approximately ten years, but had to close the store after the second automobile accident because he suffered seizures while in the store alone. (*See* R. 64–65.) Although the plaintiff states that he was taken to the hospital after one such seizure, no medical records of treatment are included in the record.

The ALJ had before him medical evidence covering the period from September 1994 through April 1997. A summary of the evidence follows.

On September 2, 1994, the plaintiff was involved in a motor vehicle accident when the car in which he was a passenger collided with a bus. (*See* R. 169.) The plaintiff initially consulted his physician who observed tenderness in the paracervical area on the left and decreased range of motion of the neck. The physician recommended anti-inflammatories, muscle relaxants and therapy. He also suggested that the plaintiff take time off from his store. (*See* R. 171.) The physical therapist noted cervical, thoracic and lumbar strain. (*See* R. 172.) Although the physical therapist indicated that he would keep the treating physician informed of the plaintiff's progress, no records referring to the physical therapy are provided.

In October 1994, the plaintiff also sought chiropractic treatment for complaints of generalized neck pain with headaches, left hand numbness and left leg and knee pain. (*See* R. 169.) The chiropractor diagnosed the plaintiff as exhibiting cervical sprain or strain with post traumatic headaches and lumbar sprain or strain with radiculitis. (*See* R. 167, 169.) The plaintiff was treated with spinal manipulation and physical therapy and was encouraged to use a home stretching and strengthening exercise program. (*See* R. 169.) The chiropractor noted that the plaintiff reached maximum medical improvement with a 5% permanent partial impairment of the cervical and lumbar spine. (*See* R. 168.)

On January 15, 1995, the plaintiff was involved in a second automobile accident in which he struck his head on the rear view mirror and was thrown into the dashboard. (*See* R. 148.) Following the accident, he was treated for complaints of neck, head, shoulder and back pain at St. Vincent's Medical Center. (*See* R. 146–47.) An x-ray of the cervical spine revealed a narrowing of the C5–6 interspace which appeared longstanding. No acute traumatic or destructive abnormalities were observed. (*See* R. 147.) On February 21, 1995, the plaintiff's treating physician noted that the plaintiff's neck and lower back pain were improved from his initial visit on January 23, 1995. The treating physician also noted that the plaintiff's knee still bothered him, but that he exhibited no new symptoms. The plaintiff did not keep a May 22, 1995 follow-up appointment. (*See* R. 149.)

On February 15, 1995, the plaintiff sought chiropractic treatment. (*See* R. 164.) He was diagnosed as experiencing cervical sprain or strain with post traumatic headaches and lumbar sprain or strain. (*See* R. 165.) As of the final examination on July 14, 1995, the chiropractor noted that although the plaintiff continued to complain of moderate neck and low back pain with two or three headaches each

week, he had reached maximum medical improvement with a 7% permanent partial impairment of the cervical and lumbar spine. (*See* R. 163–64.)

The same day he completed chiropractic treatment for injuries from the second accident, the plaintiff was involved in a third automobile accident. On July 17, 1995, he sought treatment from his chiropractor for generalized complaints of neck, midback and low back pain. The chiropractor diagnosed the plaintiff as suffering from cervical, thoracic and lumbar sprain or strain and recommended a course of chiropractic manipulation accompanied by physical therapy. (*See* R. 153–55.) The plaintiff underwent chiropractic treatment from July 17, 1995 through August 23, 1996. (*See* R. 161.) The chiropractor's final assessment was that the plaintiff's thoracic sprain or strain had resolved, but that he experienced a 3–5% permanent partial impairment of the cervical and lumbar spine. (*See* R. 162.)

In June 1996, the plaintiff underwent a consultative examination. (*See* R. 150–52.) The plaintiff reported that he suffered from back pain and headaches caused by many motor vehicle accidents. He stated that he did not take any medication because he could not afford to pay for it, but that he did visit a chiropractor. He began using a cane two years earlier on his own initiative. The plaintiff reported that he could stand for "a fair length of time" as long as he did not have to remain in one position for a long time. The consultative physician estimated that the plaintiff could stand for at least 15–20 minutes. The physician noted no impairments of speech, vision or hearing, but observed that the plaintiff had difficulty bending and carrying heavy objects. (*See* R. 150.) The plaintiff stated that he lived alone or, at times, with his sister. He spent his time watching television and reading and could manage light activities of daily living. The consultative physician opined that the plaintiff's seizures, last documented in 1980, were related to a drinking problem.

The plaintiff reported no recent seizures and indicated that he took no medication for seizures. (*See* R. 151.)

Upon examination, the consultative physician noted that the plaintiff's lumbosacral flexion and straight leg raising were limited to 60˝and that he had a normal range of motion in his hands, elbows and shoulders. The physician observed that the plaintiff limped mildly with the cane and showed no motor or sensory deficit. Upon reviewing an x-ray of the plaintiff's lumbosacral spine, the consultative physician noted evidence of decreased disc space at L5–S1 and osteophyte formation over the anterior vertebral edges. (*See* R. 151–52.)

The consultative physician concluded that the plaintiff exhibited low back pain syndrome of moderate intensity and atypical headaches arising out of trauma from motor vehicle accidents. He demonstrated no problem with seizures at the time of the examination. The physician opined that the plaintiff's condition could be improved with medical and physical therapy but noted that the plaintiff lacked the means to get the required therapy. (*See* R. 152.)

In October 1996, the plaintiff underwent a second consultative examination with the same physician. (*See* R. 156–58.) The physician noted that the plaintiff could walk a distance of one-half block and sit normally for five or six minutes at a time. The plaintiff now reported that he used a cane on the recommendation of his chiropractor and stated that he had not attempted walking without the cane. (*See* R. 156.) The plaintiff said that he lived alone and had not worked since he closed his variety store three or four years earlier. (*See* R. 157.) The physician described the plaintiff's gait as slow with no significant limping. (*See* R. 158.)

The consultative physician described the plaintiff as exhibiting low back syndrome with exact etiology undetermined. Previous x-rays were consistent with osteoarthritis. He opined that the plaintiff would be moderately limited in strenuous physi-

cal activity like excessive walking, bending and standing because of the low back discomfort. (*See id.*)

In January 1997, the plaintiff visited an orthopedic surgeon for a second opinion on his condition. The orthopedist described the plaintiff as suffering from continued problems of the low back with pain radiating into both calves. He noted that x-rays showed mild degenerative disease and recommended that the plaintiff undergo an MRI. At a second visit in April 1997, the orthopedist noted that the MRI revealed some degenerative changes but no disc problem. The orthopedist recommended that the plaintiff return to work. (*See* R. 160.)

On July 17, 1997, the ALJ issued his ruling denying benefits. (*See* R. 10–19.) On February 20, 1998, the Appeals Council denied the plaintiff's August 13, 1997 request for review. (*See* R. 4–5, 6–9.) The plaintiff timely filed this appeal within the sixty day period after receipt of the decision of the Appeals Council.

## STANDARD OF REVIEW

■ The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Yancey v. Apfel*, 145 F.3d 106, 110 (2d Cir.1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F.Supp.2d 179, 189 (D.Conn.1998); *Rodriguez v. Califano*, 431 F.Supp. 421, 423 (S.D.N.Y.1977). The court may not decide facts, reweigh evidence or substitute its

judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir.1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. Furthermore, " '[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles.' " *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir.1998) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987)).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. *See* 42 U.S.C. § 423(a)(1). Additionally, indigent individuals may be entitled to disability benefits under the Supplemental Security Income program. 42 U.S.C. §§ 1381–1383(c). "Disability" is defined under both programs as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1), 1382c(a)(3).

Determining whether a claimant is disabled requires a five-step process. *See* 20 C.F.R. § 404.1520. First, the court must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1510(b), 404.1572(b). If the claimant is currently employed, the claim is disallowed. *See* 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the agency must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. *See* 20 C.F.R. § 404.1520(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in appendix 1 of the regulations (the "Listings"). *See* 20 C.F.R. § 404.1520(d); *Bowen v. Yuckert*,

482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Balsamo v. Chater,* 142 F.3d at 79–80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(d); *Balsamo v. Chater,* 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(e). If the claimant cannot perform his former work, he must show, as a fifth and final step, that he is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. *See* 20 C.F.R. § 404.1520(f).

■ The initial burden of establishing disability is on the claimant. *See* 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(G). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy. *See Balsamo v. Chater,* 142 F.3d at 80 (citing cases). This may require the application of the Medical–Vocational Guidelines ("the grid") which places claimants with severe exertional impairments who can no longer perform past work into grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled. *See* 20 C.F.R. § 404.1520(f). A proper application of the grid makes vocational testing unnecessary.

■ The grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders are not covered. *See* 20 C.F.R. § 200.00(e)(2). If the grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is generally required to support a finding of residual functional capacity for substantial gainful activity. *See Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996)(citing *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986)).

## DISCUSSION

Applying the five step evaluation process, the ALJ determined that the plaintiff has not engaged in substantial gainful activity since April 22, 1996, the date he filed his applications. (*See* R. 18.) The ALJ found that the medical evidence established that the plaintiff suffered from recurrent back injuries which were sustained in a series of motor vehicle accidents. The ALJ further noted that the record does not contain objective medical evidence that would demonstrate the existence of a disability on or before June 20, 1992, the plaintiff's last insured date. (*See id.*)

The ALJ found that the plaintiff failed to demonstrate that he suffered from a severe impairment.

> After a careful review of the record, it is concluded that there is no medical evidence corroborating the alleged onset date of disability, and the claimant's allegations of pain and functional limitations are not entirely credible, apart from his recurring motor vehicle accidents (Social Security Ruling 96–7p). There basically is very little documentation of on-going treatment or diagnosis of any back condition and no documentation or diagnosis of a seizure disorder, ulcers or high blood pressure. There are minimal objective medical findings, particularly from treating and examining sources, who have consistently reported generally normal examinations with no neurological deficits (20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96–3p).

> The record does not provide objective medical findings which demonstrate significant work related limitations for a continuous period of twelve months. The claimant effectively recovered with-

in a few months from each of his motor vehicle accidents. Progress notes document that the claimant was only seen twice by Dr. Boone and received minimal treatment in 1994 .... In 1995, Dr. Micalizzi stated that back x-ray showed no apparent traumatic abnormalities .... In 1996, Dr. Thompson diagnosed cervical, thoracic, and lumbar strain/sprain, and assessed only a minimal impairment rating for insurance purposes .... In 1997, Dr. Schlein reported that there was no evidence of any apparent back condition that would prevent the claimant from returning to work .... The claimant's assertion of inability to work since September 1994, based on a back condition and seizures is inconsistent with the evidence of record including his reported business activity until April 1996.

For all the foregoing reasons the Administrative Law Judge concluded that the claimant has no severe impairment, or combination of impairments, lasting 12 consecutive months that precluded his ability to perform basic work-related activity.

(R. 17–18.) Thus, the ALJ found that the plaintiff was not disabled at any time through the date of the decision. (*See* R. 18.)

In support of his motion the plaintiff argues that the ALJ erred in failing to find a severe impairment. In response, the defendant contends that substantial evidence supports the ALJ's determination that the plaintiff failed to provide evidence that his impairment lasted or was expected to last twelve continuous months.

■ In this case, the ALJ found the plaintiff not disabled at step two of the five-step evaluation process. To satisfy step two, the plaintiff must present medical evidence demonstrating that he suffers from a severe impairment. To be disabling, the severe impairment must have lasted or be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §§ 404.1505(a), 404.1509,

404.1520(c). To satisfy the duration requirement the plaintiff must demonstrate that his disability prevented him or would prevent him from performing any substantial gainful activity for twelve continuous months. *See Neal v. Bowen*, 829 F.2d 528, 530–31(5th Cir.1987).

■ The burden is on the plaintiff to provide medical evidence to support his claim that he suffers from a disabling impairment. *See* 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(G). To meet this burden, he must provide reports about his impairment from "acceptable medical sources." 20 C.F.R. §§ 404.1513(a), 416.913(a). Although physicians are included within the definition of acceptable medical sources, chiropractors are not. Instead, chiropractors are listed in a section of the regulations describing "other sources" whose "[i]nformation ... may also help us to understand how your impairment affects your ability to work." 20 C.F.R. §§ 404.1513(e), 416.913(e). Thus, a chiropractor cannot provide a medical opinion concerning disability. *See Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir.1995).

■ In his memorandum, the plaintiff argues that the severity requirement is a minimal standard and that the ALJ erred in finding the plaintiff's recurrent back injuries did not constitute a severe impairment. The plaintiff, however, does not address the durational requirement.

The record contains minimal evidence from treating physicians. The plaintiff saw his treating physician twice after the 1994 accident. In the treatment notes, the physician did not indicate that the plaintiff's injury was disabling or would last for twelve months. The plaintiff provides no evidence that he attended the physical therapy ordered by his physician. Further, the plaintiff was released from chiropractic treatment for these injuries after a few months. Following the second accident, the plaintiff was seen by a second treating physician. The plaintiff visited the physician twice and failed to keep a

follow-up appointment. Again, the treating physician did not indicate that the injuries were disabling or would last for twelve months.

In addition to the evidence from treating physicians, the record contains reports of three consultative examinations. Two of the examinations were performed at the request of the agency. The consultative physician who performed both examinations determined that the plaintiff suffered from low back syndrome of moderate intensity which was consistent with osteoarthritis and stated that the plaintiff's condition could be improved with medical and physical therapy. The orthopedist consulted by the plaintiff recommended that the plaintiff return to work. Although the opinions of the agency consultative physician may support a finding that the plaintiff suffers from an impairment of the requisite level of severity, there is no opinion regarding the durational requirement. Thus, the court concludes that the plaintiff failed to meet his burden of demonstrating that he suffers from an impairment lasting or expected to last for at least twelve months. *See Johnson v. Chater,* 969 F.Supp. 493, 507 n. 8 (N.D.Ill.1997) (noting that finding of disability must be premised on impairment lasting at least twelve months and that no objective medical evidence in record indicated that claimant met durational requirement). The court also concludes that the decision of the ALJ that the plaintiff is not disabled is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, the defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. #12] should be GRANTED. The plaintiff's Motion for Order Reversing the Decision of the Commissioner [Doc. #9] should be DENIED.

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.,* 892 F.2d 15 (2d Cir.1989)(per curiam); *F.D.I.C. v. Hillcrest Assoc.,* 66 F.3d 566, 569 (2d Cir.1995).